**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| OANDA Corporation, | |
|      *Plaintiff* | |
| v. | Civil Action No. 2:20-cv-5784 |
| | **JURY TRIAL DEMANDED** |
| GAIN Capital Holdings, Inc.; GAIN Capital Group, LLC. | |
|      *Defendants*. | |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff OANDA Corporation ("OANDA" or "Plaintiff") complains and alleges as follows against defendants GAIN Capital Holdings, Inc. and GAIN Capital Group, LLC (dba FOREX.com) (collectively, "GAIN" or "Defendants"). These allegations are made based on personal knowledge as to OANDA with respect to its own actions, and upon information and belief as to all other matters.

**THE PARTIES**

1.    Plaintiff OANDA is a Delaware corporation, having offices at 1441 Broadway 6th Floor, Suite 6027, New York, New York 10018.

2.      OANDA is a global leader in online multi-asset trading services and currency data and analytics.

3.      OANDA is the owner, by assignment, of U.S. Patents No. 7,146,336 (the '336 Patent) and 8,392,311 (the '311 Patent), attached as Exhibit A and Exhibit B, respectively.

4.      On information and belief, Defendant GAIN Capital Holdings, Inc. is a Delaware corporation, with its global headquarters at 135 U.S. Highway 202/206, Bedminster, New Jersey 07921.

5.      On information and belief, Defendant GAIN Capital Group, LLC is a Delaware limited liability company, with its global headquarters at 135 U.S. Highway 202/206, Bedminster, New Jersey 07921.

6.      On information and belief, GAIN Capital Group, LLC owns and operates the website https://forex.com, among others, which provides foreign exchange (also known as "forex" or "FX") trading and brokerage services, including an online trading platform, and which infringes OANDA's patent rights as described herein.

7.      On information and belief, GAIN Capital Holdings, Inc. owns and operates the website https://www.gaincapital.com and uses the services of GAIN Capital Group, LLC, including the application programming interfaces (APIs) provided by https://forex.com, to operate automated trading platform(s).

**JURISDICTION AND VENUE**

8.     This is an action for patent infringement arising under 35 U.S.C. §1, *et seq*.

9.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331.

10.    This Court has both general and specific personal jurisdiction over Defendants.  Each of the Defendants has sufficient minimum contacts within the State of New Jersey (including via Defendants locating their worldwide headquarters here, as well as sales of Defendants' products and services in New Jersey), pursuant to due process and/or the New Jersey Long Arm Statute, because Defendants purposefully availed themselves of the privileges of conducting business in New Jersey, because Defendants regularly conduct and solicit business within New Jersey, and because Plaintiff's causes of action arise directly from Defendants' business contacts and other activities in the State of New Jersey.

11.    Venue is proper in this District pursuant to 28 U.S.C. §1400(b) because Defendants have committed acts of infringement in this District, including at least those acts complained of herein, and have regular and established places of business in New Jersey.

//

//

### THE SCHOLARSHIP & INVENTIONS OF OANDA

12.     OANDA, a market leader in currency data and currency trading, was founded in 1996 by Dr. Michael Stumm and Dr. Richard Olsen.

13.     Dr. Michael Stumm is a teacher, researcher, entrepreneur, and executive. As a professor in the University of Toronto's Department of Electrical and Computer Engineering, he has published over 100 papers in top-tier conference proceedings and scientific journals.  Dr. Stumm is the inventor or co-inventor on fifteen U.S. patents related to market and currency trading and telecommunications networks.

14.     Dr. Richard Olsen is an academic, entrepreneur, and founder of Olsen Ltd., a leading econometric research and development firm.  Dr. Olsen is the lead author of the textbook, *An Introduction to High-Frequency Finance* (Academic Press, 2001), which provides the first and only source of unified information about high-frequency data, with a particular emphasis on foreign exchange markets.  Dr. Olsen is the inventor or co-inventor on nine U.S. patents related to market and currency trading.

15.     Dr. Stumm and Dr. Olsen's vision in founding OANDA was to make currency exchange rate information more accessible to a broader audience.  By the mid-1990s, even with the advent of the internet, there were no centralized, transparent exchanges for currencies that retail investors could access, as there were

4

for stocks.  That lack of transparency allowed large banks and currency dealers to maintain large "spreads" (the price difference between where a trader may purchase or sell an underlying asset) for retail customers.

16.    In 1996, OANDA launched the world's largest and most accurate database of currency prices, employing Dr. Stumm's technological expertise and Dr. Olsen's expertise in currency markets.  OANDA soon became the gold standard for forex prices and interbank exchange rates online, relied upon by major corporations, auditing firms, and individual traders alike.

17.    In 2000, Dr. Stumm and Dr. Olsen had the idea to create an online automated trading platform, through which they could offer individual investors the more favorable rates banks used to trade currency among themselves.  Prior to that, while OANDA had made accurate exchange rates more available to the public, banks and currency dealers continued to charge consumers large spreads when trading currency.  While some online trading platforms existed at that time, they suffered from a number of deficiencies.  In the then-existing online currency market, for example, a trade went through three steps from initiation to execution: (1) the trader specified to a dealer the "currency pair" (a price quote of the exchange rate for two different currencies traded in forex markets) and the amount that the trader would want to trade (without specifying whether he or she would like to buy or sell); (2) the dealer specified to the trader both a bid and an ask price and gave the trader

several seconds to respond, in order to protect against price fluctuations (the dealer not knowing whether the trader would buy, sell, or reject the offer); and (3) the trader either rejected the offer or specified whether the trader was buying or selling (with his or her response having to occur within a timeframe of a few seconds).

18.     This "three-way handshake" created problems, including that potential internet delays might not allow the trader to respond within the few-seconds window, and that corporate firewalls restricted the flow of information outside the corporate network.

19.     Dr. Stumm and Dr. Olsen used their combined expertise to invent systems and methods for online currency trading that overcame these and other deficiencies of then-existing online currency trading.  Their inventions, for example, allowed for execution of online currency transactions with only two communications, instead of three, eliminated the previous problems with timing lags, and built in automated protections against price fluctuations.  Dr. Stumm and Dr. Olsen were granted patent protection on these novel systems and methods, including the '336 and '311 Patents, among others.

20.     These inventions were embodied in OANDA's pioneering currency trading platform, fxTrade, which launched in 2001.  The first fully automated online currency trading platform, fxTrade, among other features, monitored market exchange rates, offered immediate price quotes (with a much smaller spread than

offered by banks), executed trades instantaneously, and prevented clients from risking too much money through automatic stop-loss orders.  It also allowed customers to trade with deposits as small as one dollar, while charging interest on leveraged trades on a second-by-second basis.

21.    As stated in the provisional patent application that forms the basis for the '336 and '311 Patents, and which is also the manuscript for the textbook *An Introduction to High-Frequency Finance*:

> As the archetype of financial markets, the foreign exchange market is the largest financial market worldwide. It involves dealers in different geographic locations, time zones, and working hours who have different time horizons, home currencies, information access, transaction costs, and other institutional constraints.

Ex. C, US Provisional Patent App. 60/274,174, p.15; *see also* Olsen, *et al*., *An Introduction to High-Frequency Finance*, Preface, p. xxi.

22.    Additionally, the provisional patent discussed the skepticism amongst academics and others at the time to the innovations and inventions of the patents-in-suit:

> Recently, the skepticism among academics to the possibility of developing profitable trading models has decreased with the publication of many papers that document profitable trading strategies in financial markets, even when including transaction costs.
>
> …

The purpose of this chapter is not to provide *ready-to-use* trading strategies, but to give a description of the main ingredients needed for any real-time trading model to be usable for actual trading on financial markets.  Any reasonable trading strategy is composed of a set of tools that provides trading recommendations within a capital management system.

…

To construct successful trading strategies is not an easy task and many possible mistakes must be avoided during the different development phases of new models.  We shall describe here some of the main traps in which new system designers generally fall and provide some ideas as to how to construct more robust trading strategies.

Ex. C, US Provisional Patent App. 60/274,174, pp. 315-317; *see also* Olsen, *et al.*, *An Introduction to High-Frequency Finance*, Ch. 11 – Trading Models, pp. 295-297 (Academic Press, 2001) (emphasis in original).

### THE '336 PATENT

23.     On December 5, 2006, the United States Patent and Trademark Office duly and legally issued United States Patent No. 7,146,336, entitled "Currency Trading System, Methods, and Software."  A true and correct copy of the '336 Patent is attached as Exhibit A.

24.     The '336 Patent and its claims are entitled to, at least, the benefit of the filing date of its provisional patent application, 60/274,174, which was filed on March 8, 2001.  A true and correct copy of the provisional patent application 60/274,174 is attached as Exhibit C.

8

25.   OANDA is the owner, by assignment, of the '336 Patent.

26.   The '336 Patent teaches, among other things:

In one aspect, the present invention comprises a system for trading currencies over a computer network. A preferred embodiment comprises: (a) a server front-end; (b) at least one database; (c) a transaction server; (d) a rate server; (e) a pricing engine; (f) an interest rate manager; (g) a trade manager; (h) a value at risk server; (i) a margin control manager; (j) a trading system monitor; and (k) a hedging engine. In another aspect, the present invention comprises methods for trading currency over a computer network. In another aspect, the present invention comprises software for currency trading over a computer network.

U.S. Patent 7,146,336, Abstract.

27.   The claims of the '336 Patent are, and are presumed to be, valid, patent-eligible and enforceable.

28.   The claims of the '336 Patent are not directed to an abstract idea or concept.   Rather, they are directed to specific implementations of computerized trading systems and interfaces for trading currencies (e.g., foreign exchange or "forex").

//

//

//

//

//

//



('336 Patent, Fig. 2)

29.    Each of the claims of the '336 Patent is inventive over the prior art, including but not limited to independent claims 1-5, 7, and 11, and dependent claims 6 and 8-10.   Specifically, the claims are non-abstract and embody an inventive concept at least because their claimed elements, combinations of elements, and the interactions between those elements was not well-understood, routine, and conventional at the time of the application.

30.    The claims of the '336 Patent claim technological improvements on the prior art, including but not limited to the Piskiel, Heinzle, Usher, Selleck, Szoc, Tsagarakis, Lange, and Rossman references listed on the face of the patent.

31.    The '336 Patent's improvements over traditional on-line currency trading are discussed within the specification of the patent itself, including the

limitations of the prior art's traditional systems.  *See* '336 Patent, Col. 1:18-43. These improvements and the claims of the '336 Patent, as well as the use of the claim elements to accomplish the goals of the invention, were inventive, unconventional, and not well known as of the priority date of the '336 Patent.

32.    The '336 Patent's benefits include, but are not limited to, that its claimed teachings lessened or eliminated the problems of, among other things, paying and collecting interest, and executing stored orders, as discussed in the specification.  The claimed inventions are able to overcome these at least because, by having a computerized interest rate manager calculate, pay out, and collect interest on a tick-by-tick basis, or by having a trade manager check stored orders, more accurate and comprehensive trades and payments of interest (e.g., "rollover") can be accomplished than is possible with human beings involved.  In this respect, the claimed systems make it both quantitatively and qualitatively different from what can be accomplished by humans, teams of humans, or the prior art systems.

33.    For example, the computerized interest rate managers claimed by the '336 Patent enable accurate payment and collection of interest, even on small positions, which would have been impossible and unprofitable to calculate using humans.  Similarly, the computerized trade manager claimed by the '336 Patent makes tracking and execution of varied and complex stored orders (e.g., stop loss, take profit, and limit) possible, in real time, with an accuracy that would be

impossible for humans to attain, not least because – due to the extremely high frequency of the price movements – it would be physically impossible for humans to simultaneously monitor the price movements, receive and input orders from traders, compare the current prices against the stored orders, and report the execution back to the traders.

34.     Moreover, as discussed and claimed by the '336 Patent in Claim 11, by implementing the disclosed trading system, brokers can automatically catch traders or accounts who are operating outside their margin limits and automatically liquidate their holdings in real time.  This protects the broker from the credit risk of positions held in accounts on margin that are overrunning their margin limits.

35.     As discussed in the specification of the '336 Patent, this approach to trading currencies is unconventional and a sharp departure from the traditional methods described in the specification and in the prior art.

36.     Each of the claims of the '336 Patent are patentably distinct from each other and offer individualized technological improvements and differing inventive concepts, which vary each claim from the other claims. None of the claims of the '336 Patent are duplicative or representative of the other claims because the technological limitations of each claim differ from the others.

37.     For example, Claim 6, which depends from Claim 5, adds the limitation:

> *wherein said pricing engine is further operable to compute currency exchange rates based on positions held by said system.*

This limitation is not present in Claim 5 and adds the specific technological requirements recited therein, which improve on the prior art systems and methods; in this case, a way for the system operator to take into account its own positions to advantageously set exchange rates.

38. For a further example, Claim 10, which depends from Claim 8, adds the limitation:

> *at least one of said one or more trading models comprises: (a) a price collector component; (b) a price filter component; (c) a price database component; (d) a gearing calculator component; (e) a deal acceptor component; (f) an opportunity catcher component; and (g) a book-keeper component.*

This limitation is not present in Claim 8 and adds the specific technological requirements recited therein, which improve on the prior art systems and methods; in this case, that the system include subsystems for, among other things, monitoring and acting on prices, gearing, deals, and opportunities.

39. Regarding independent claims 1-5, 7, and 11, it was not well-understood, routine, and conventional at the time of the application to trade currencies over a computer network using a trading client system, as specified in those claims, at least because of the deficiencies of the prior art systems described in the specification and in the prosecution history.

40.     Regarding dependent claims 6 and 8-10, each of these dependent claims add the additional specific limitations recited therein to the claims from which they depend, further reinforcing and adding to the specific technological requirements of the claimed methods.

41.     Further, the claims of the '336 Patent claim specific technological improvements on pre-existing technological systems and methods, including the traditional on-line currency markets discussed in the patent, as well as the prior art patents and other references cited on the face of the patent (e.g., Piskiel, Heinzle, Usher, Selleck, Szoc, Tsagarakis, Lange, and Rossman.)

42.     Regarding each of the independent claims, it was further not well understood, routine, and conventional to combine the elements of these independent claims with the elements of their respective allowed dependent claims.

## THE '311 PATENT

43.     On March 5, 2013, the United States Patent and Trademark Office duly and legally issued United States Patent No. 8,392,311, entitled "Currency Trading System, Methods, and Software."  A true and correct copy of U.S. Patent No '311 is attached as Exhibit B.

44.     The '311 Patent and its claims are entitled to, at least, the benefit of the filing date of its provisional patent application, 60/274,174, which was filed on March 8, 2001.  Exhibit C.

45.   OANDA is the owner, by assignment, of the '311 Patent.

46.   The '311 Patent teaches, among other things:

> In one aspect, the present invention comprises a system for trading currencies over a computer network. A preferred embodiment comprises: (a) a server front-end; (b) at least one database; (c) a transaction server; (d) a rate server; (e) a pricing engine; (f) an interest rate manager; (g) a trade manager; (h) a value at risk server; (i) a margin control manager; (j) a trading system monitor; and (k) a hedging engine. In another aspect, the present invention comprises methods for trading currency over a computer network. In another aspect, the present invention comprises software for currency trading over a computer network.

U.S. Patent 8,392,311, Abstract.

47.   The claims of the '311 Patent are, and are presumed to be, valid, patent-eligible and enforceable.

48.   The claims of the '311 Patent are not directed to an abstract idea or concept.  Rather, they are directed to specific implementations of computerized trading systems and interfaces for trading currencies (e.g., foreign exchange or "FX").

49.   Each of the claims of the '311 Patent is inventive over the prior art, including but not limited to independent claims 1 and 7 and dependent claims 2-6. Specifically, the claims are non-abstract and embody an inventive concept at least because their claimed elements, combinations of elements, and the interactions between those elements, was not well-understood, routine, and conventional at the time of the application.

50.    The claims of the '311 Patent claim technological improvements on the prior art, including but not limited to the Potter, Buchalter, Selleck, Szoc, Cagan, McDermott, and Turton references listed on the face of the patent.

51.    The '311 Patent's improvements over traditional on-line currency trading are discussed within the specification of the patent itself, including the limitations of the prior art's traditional methods.  *See* '311 Patent, Col. 1:20-39. These improvements and the claims of the '311 Patent, as well as the use of the elements of the claims to accomplish the goals of the invention, were inventive, unconventional, and not well known as of the priority date of the '311 Patent.

52.    The '311 Patent's benefits include, but are not limited to, that its claimed teachings lessened or eliminated the problems of the three-way handshake, as discussed in the specification.  The claimed inventions were able to overcome the problems of the three-way handshake at least because, by cutting out human beings from certain parts of the process and having a client-server computer system transmit constantly updated exchange rates and prices, and constantly receive orders, the customers (traders) using the system will have more accurate pricing data due to decreases in the latency of the system.  Additionally, by having the system constantly receive orders from traders, the incidence of orders refused because the price had changed while the trader was waiting for a response from a human is greatly reduced.



('311 Patent, Fig. 3)

53.     As discussed in the specification, this approach to trading currencies is unconventional and a sharp departure from the traditional method described as the three-way handshake in the specification.

54.     Each of the claims of the '311 Patent are patentably distinct from each other and offer individualized technological improvements, and differing inventive concepts, which vary each claim from the other claims. None of the claims of the '311 Patent are duplicative or representative of the other claims because the technological limitations of each claim differ from the others.

55.     For example, Claim 2, which depends from Claim 1, adds the limitation:

> *wherein the requested trade price is derived from a respective one of the first price or second price of the received current exchange rate and a user input limit value defining a maximum acceptable difference between the respective one of the first price or second price of the received current exchange rate received at the trading client system and the respective one of the first price or second price of the corresponding current exchange rate determined at the trading client system at which the trade can be effected.*

This limitation is not present in Claim 1 and adds the specific technological requirements recited therein, which improve on the prior art systems and methods; in this case, a specific method for deriving the requested trade price at the trading client system.

56.    For a further example, Claim 4, which depends from Claim 2, adds the limitation:

> *displaying to the user a set of input fields to define a desired trade, the input fields including an identification of the pair of currencies the user desires to trade, the amount of the currencies desired to be traded, the selected first price or second price of the current exchange rate received at the trading client system and a limit value, and where the input fields to identify the pair of currencies and the first price or second price are populated with appropriate values determined from the user's selection of the one of the first price or second price;.*

This limitation is not present in Claim 1 or Claim 2 and adds the specific technological requirements recited therein, which improve on the prior art systems and methods; in this case, a particular user interface that includes input fields to

define a desired trade, including an identification of the pair of currencies the user desires to trade.

57.    Regarding independent claims 1 and 7, it was not well-understood, routine, and conventional at the time of the application to trade currencies over a computer network using a trading client system, as specified in claims 1 and 7 of the '311 Patent, at least because of the deficiencies of the prior art systems described in the specification and in the prosecution history.

58.    Regarding dependent claims 2-6, each of these dependent claims add the additional specific limitations recited therein to the claims from which they depend, further reinforcing and adding to the specific technological requirements of the claimed methods.

59.    Further, the claims of the '311 Patent claim specific technological improvements on pre-existing technological systems and methods, including the traditional on-line currency markets discussed in the patent, as well as the prior art patents and other references cited on the face of the patent (e.g., Potter et al., Buchalter, Selleck, Szoc et al., Cagan, McDermott, and Turton.)

60.    Regarding each of the independent claims, it was further not well understood, routine, and conventional to combine the elements of said independent claims with the elements of their respective allowed dependent claims.

## DEFENDANTS' INFRINGEMENT

61.     Defendant   Gain   Capital   Group,   LLC   operates   the   website https://forex.com, where it, as shown in the screenshot below, provides an online currency trading platform.  Defendant also offers desktop and mobile apps, API access, white-label systems (Defendants' systems being offered under another company's label), and other technological mechanisms for foreign exchange trading. Defendant GAIN Capital Holdings, Inc. uses GAIN Capital Group, LLC's platform, including the APIs, to operate automated infringing trading systems.



62.     Defendants' platforms and systems practice each and every limitation of claims 1-11 of the '336 Patent and claims 1-7 of the '311 Patent.

63.     Plaintiff identifies, on the claim charts attached, those elements of Defendants' platforms and systems that Plaintiff believes at this time practice each of the individual limitations of the '336 and '311 Patents.

64.     Plaintiff's identification of Defendants' infringement is preliminary, and Plaintiff expects to identify additional acts of infringement, and additional mechanisms by which Defendants platforms and systems infringe, upon a reasonable opportunity for discovery.

## COUNT I –INFRINGEMENT OF '336 PATENT

65.     The foregoing numbered paragraphs are incorporated by reference into this section.

66.     Defendants have infringed one or more claims of the '336 Patent by making, using, selling, offering for sale, or selling products and/or services that meet each of the limitations of one or more claims of the '336 Patent.  More specifically, Defendant GAIN Capital Group, LLC has made, used, sold, and offered for sale infringing instrumentalities at https://forex.com, and GAIN Capital Holdings, Inc. has used those infringing instrumentalities, including the application programming interfaces ("APIs"), to operate automated infringing trading systems.

67.     Defendants have continued to operate their online trading platforms and systems in an infringing manner, despite being notified of its infringement by Plaintiff on at least one occasion by letter specifically referencing the '336 Patent.

68.     Defendants infringe each and every limitation of at least Claim 1 of the '336 Patent.  *See* Claim Chart for '336 attached as <u>Exhibit D</u>.

## COUNT II –INFRINGEMENT OF '311 PATENT

69.     The foregoing numbered paragraphs are incorporated by reference into this section.

70.     Defendants have infringed one or more claims of the '311 Patent by making, using, selling, offering for sale, or selling products and/or services that meet each of the limitations of one or more claims of the '311 Patent.  More specifically, Defendant GAIN Capital Group, LLC has made, used, sold, and offered for sale infringing instrumentalities at https://forex.com, and GAIN Capital Holdings, Inc. has used those infringing instrumentalities, including the APIs, to operate automated infringing trading systems.

71.     Defendants have continued to operate their online trading systems in an infringing manner, despite being notified of their infringement by Plaintiff on at least one occasion by letter specifically referencing the '311 Patent.

72.     Defendants infringe each and every limitation of at least Claim 1 of the '311 Patent.  *See* Claim Chart for '311 attached as <u>Exhibit E</u>.

## COUNT III – CONTRIBUTORY OR INDUCED INFRINGEMENT

73.     The foregoing numbered paragraphs are incorporated by reference into this section.

74.     On information and belief, Defendants use subcontractors, managers, agents, or other third parties ("Third-Party Infringers") to operate or assist in the

management of its online trading systems, or to provide additional services in connection with its services, including by use of its platform's APIs.   These subcontractors or other third parties infringe one or more of the claims of the patent in suit.

75.   Defendants were aware of their infringement of the '336 and '311 Patents at least as early as October 25, 2018, when Plaintiff notified Defendants, by letter, of its infringement and yet Defendants continue to cause its Third-Party Infringers to operate or assist in the management of its online trading platforms on its behalf.

76.   Defendants continued use of Third-Party Infringers to operate its online trading platforms on its behalf constitutes contributory and/or induced infringement.

### COUNT IV – WILLFUL INFRINGEMENT

77.   The foregoing numbered paragraphs are incorporated by reference into this section.

78.   At least as early as October 25, 2018, Defendants have been aware of its infringement of OANDA's patents.   On that date, OANDA notified Defendants, by letter, of its infringement and demanded that Defendants take a license or cease its infringement.   Defendants declined to do so.

79.   Defendants' continued infringement of the patent is willful given its knowledge of the '336 Patent and '311 Patent.

**PRAYER FOR RELIEF**

Plaintiff prays for entry of judgment against Defendants, jointly and severally, granting relief as follows:

A. judgment that Defendants have infringed and continue to infringe one or more claims of the '336 and '311 Patents, directly and/or indirectly, literally and/or under the doctrine of equivalents;

B. judgment that Defendants contribute to and induce the infringement of one or more claims of the '311 and '336 Patents, literally and/or under the doctrine of equivalents;

C. an Order for an accounting;

D. an award of damages pursuant to 35 U.S.C. §284 sufficient to compensate Plaintiff for Defendants' past infringements, and any continuing or future infringement, up until the date that Plaintiff's patent expires;

E. a determination of a reasonable royalty for any future infringement by Defendants, and an Order directing Defendants to pay such royalty on future infringement;

F. as assessment of pre-judgment and post-judgment interest and costs against Defendants, and an Order awarding such interest and costs, in accordance with 35 U.S.C. §284;

G. that Defendants be directed to pay enhanced damages, including Plaintiff's attorneys' fees, incurred in connection with this lawsuit pursuant to 35 U.S.C. §285;

H. an injunction against continued infringement, including but not limited to an injunction against Defendants and/or their agents; and

I. such other and further relief as this Court may deem just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury on all issues.

Date: May 11, 2020                         Respectfully Submitted,

By:   /Erik Dykema/

Erik Dykema
(NJ Bar No. 021652010)
erik@kzllp.com
**Koning Zollar LLP**
4 Manheim Road
Essex Fells, New Jersey 07021
T: 858.252.3234
F: 858.252.3238

Drew Koning
*(pro-hac vice application to be filed)*
drew@kzllp.com
Blake Zollar
blake@kzllp.com
*(pro-hac vice application to be filed)*
**Koning Zollar LLP**
169 Saxony Road, STE 115

Encinitas, CA 92024
T: 858.252.3234
F: 858.252.3238

Shaun Paisley
*(pro-hac vice application to be filed)*
shaun@kzllp.com
**Koning Zollar LLP**
470 James Street, Suite 007
New Haven, CT 06513
T: 203.951.1213
F: 858.252.3238

*ATTORNEYS FOR PLAINTIFF*
OANDA Corporation